1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LOTICAL CHASTANG,                          No. 2:16-cv-2080 JAM KJN P

12                  Plaintiff,

13          v.                                   FINDINGS AND RECOMMENDATIONS

14   D. BAUGHMAN, et al.,

15                  Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding pro se and in forma pauperis, in this civil rights

19   action filed pursuant to 42 U.S.C. § 1983.  In his amended complaint, plaintiff contends that

20   defendants Walcott, Curren, Haque, and Swartz were deliberately indifferent to his serious

21   medical needs in violation of the Eighth Amendment.  Pending before the court is defendants'

22   motion for summary judgment.  As discussed below, the undersigned recommends that the

23   motion be granted.

24   II.  Plaintiff's Verified Complaint

25          On April 17, 2013, plaintiff alleges that Dr. Curren and Dr. Swartz were deliberately

26   indifferent to plaintiff's medical needs by reading his medical file and involuntarily medicating

27   plaintiff with Depakote that caused plaintiff to suffer liver damage and diabetes.  (ECF No. 1 at

28   3.)  Further, plaintiff states that Dr. Haque and Dr. Walcott were deliberately indifferent when

                                               1

they renewed the involuntary medication, despite plaintiff's efforts to explain his medical problems. Plaintiff contends he sustained liver damage from the Depakote.

III. <u>Undisputed Facts</u>[1] ("UDF")

1. Plaintiff Loticol Chastang is an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") who was incarcerated at California State Prison, Sacramento ("SAC") in Represa, California at all times relevant to this lawsuit. (ECF No. 1 at 1.)

2. Plaintiff has no formal medical training or education and did not graduate from high school. (Pl. Dep. at 12; 14.)

3. At all times relevant to this lawsuit, defendants Walcott, Curren, Haque, and Swartz were psychiatrists in varying roles with CDCR at SAC. (ECF Nos. 41-4 at 1; 41-5 at 1-2; 41-6 at 2; 41-7 at 2.)

4. At all times relevant to this lawsuit, Dr. Walcott was a Forensic Evaluating Psychiatrist at SAC responsible for evaluating inmates and providing his professional opinion on their ability to provide informed consent for psychiatric medications treatment in relation to Keyhea Order placement.[2] (ECF No. 41-7 at 2.)

5. During all times relevant to this lawsuit, Dr. Walcott was not plaintiff's treating psychiatrist and did not have a doctor/patient relationship with plaintiff. (ECF No. 41-7 at 2-3.)

6. From December 2012 through June 30, 2015, Dr. Swartz was the Chief Psychiatrist at SAC. (ECF No. 41-6 at 2.)

7. As Chief Psychiatrist, Dr. Swartz reviewed Keyhea applications (requests for court ordered psychiatric medication of inmates), consulted with the treating physicians, and reviewed inmate medical records prior to the approval and implementation of a Keyhea order. She also occasionally renewed inmate medications when treating psychiatrists were out, and authorized

---

[1] For purposes of summary judgment, the undersigned finds these facts are undisputed.

[2] "A Keyhea order permits the long-term involuntary medication of an inmate upon a court finding that the course of involuntary medication is recommended and that the prisoner, as a result of mental disorder, is gravely disabled and incompetent to refuse medication, or is a danger to himself or others." <u>Davis v. Walker</u>, 745 F.3d 1303, 1307 n.2 (9th Cir. 2014), citing <u>Keyhea v. Rushen</u>, 178 Cal. App. 3d 526 (1986).

emergency involuntary medication of inmates pending Keyhea orders.  (ECF No. 41-6 at 2, 4.)

8.  Dr. Curren was a staff psychiatrist at SAC from July 1999, until he retired in August 2015. He returned as a contract psychiatrist at SAC from October 2015 to April 2016, then again from January 2017 to January 2018.  (ECF No. 41-4 at 1.)

9.  As a staff psychiatrist, Dr. Curren often evaluated inmate patients for Keyhea Orders. He also treated patients in the Mental Health Crisis Beds ("MHCB").  (ECF No. 41-4 at 2.)

10.  Dr. Haque has been a staff psychiatrist at SAC since June 2013, and was plaintiff's treating psychiatrist from December 19, 2013, through April 15, 2014.  (ECF No. 41-3 at 1-2.)

11.  A Keyhea order is a court order under California Penal Code Section 2602 which requires an inmate to take psychiatric medications when that inmate is incapable of making a decision as to whether or not to take medication to treat specific psychiatric conditions.  (ECF No. 41-7 at 2; Pl. Dep. at 40.)

12.  The Keyhea order does not prescribe or designate a specific medication, but it does provide that the inmate must take medication to treat specific psychiatric conditions when that inmate will be a harm to himself or others without the medication.  (ECF No. 41-7 at 2; Pl. Dep. at 40-41.)

13.  The Keyhea order further allows for treating medical staff to involuntarily medicate an inmate, for that inmate's safety and those around him, when he refuses to take the prescribed medications to treat his psychiatric conditions.  (ECF No. 41-7 at 2; Pl. Dep. at 40-41.)

14.  On April 18, 2013, after plaintiff attempted to jump out of a window and injured five officers, Dr. Curren requested emergency involuntary medication for plaintiff pending a Keyhea hearing on May 8, 2013, which Dr. Swartz approved. This request was based on plaintiff's danger to himself and others, combined with his refusal to take necessary psychiatric medications.  (ECF Nos. 1 at 21-24; 41-4 at 3; 41-6 at 2-3; 41-10 at 2-8.)

15.  Dr. Curren authored the initial declaration in support of the Keyhea Order on April 18, 2013, which was granted on May 8, 2013.  (ECF Nos. 1 at 22-24, 26; 41-4 at 3.)

16.  On March 19, 2014, Dr. Haque evaluated plaintiff in order to determine whether plaintiff's Keyhea Order should be renewed.  (ECF Nos. 41-5 at 2; 41-14 at 5.)

3

17. During the March 19, 2014 interview, plaintiff expressed to Dr. Haque that he did not think he had a mental illness and did not need medication. (Id.)

18. At that time, Dr. Haque also assessed plaintiff's lab results and all were essentially within normal limits. (Id.)

19. Following the March 19, 2014 interview, Dr. Haque recommended that plaintiff continue on his prescribed medications, including Depakote, as there were no medical indications to change plaintiff's medications. (ECF Nos. 41-5 at 2-3; 41-14 at 5-6.)

20. Following the interview on March 19, 2014, Dr. Haque recommended that plaintiff's Keyhea Order be renewed because plaintiff's serious mental disorder caused him to be a continued danger to himself and others. (ECF Nos. 41-5 at 3; 41-18 at 38-45.)

21. Despite not wanting to take his prescribed medications, plaintiff admitted that if he were not medicated, "people are going to get hurt." Plaintiff also suffered from poor insight into his mental illness and did not have capacity to give informed consent regarding his treatment. (ECF Nos. 41-5 at 3; 41-18 at 42-43, 45.)

22. Dr. Walcott evaluated plaintiff in his capacity as a Forensic Evaluating Psychiatrist for a Keyhea renewal on March 10, 2015. (ECF No. 41-7 at 2.)

23. At the outset, Dr. Walcott informed plaintiff he was not part of plaintiff's treatment team, was not responsible for plaintiff's psychiatric medication treatment, and that the interview with Dr. Walcott would not be confidential with respect to the judge evaluating his Keyhea renewal petition. (ECF No. 41-7 at 2.)

24. Forensic Evaluation encounters prefaced with this disclaimer of lack of treatment relationship are not considered to establish any sort of fiduciary or traditional physician/patient treatment relationship. (ECF No. 41-7 at 2-3.)

25. After establishing a Forensic Evaluation relationship, the psychiatrist is prohibited from providing any foreseeable treatment to the person who was evaluated with the exception of emergency treatment. Therefore, when Dr. Walcott evaluated plaintiff in March 2015 for plaintiff's Keyhea renewal, there was no doctor patient relationship and Dr. Walcott was not part of plaintiff's medical treatment team. (ECF No. 41-7 at 3.)

4

26. Dr. Walcott had no role in the medication prescribed to plaintiff, including, but not limited to Depakote. (Id.)

27. In evaluating plaintiff for the Keyhea renewal, Dr. Walcott conducted a detailed review of plaintiff's relevant medical and mental health records and interviewed him at length. As such, Dr. Walcott was able to provide a detailed analysis of plaintiff's lack of decision-making capacity with respect to plaintiff's psychiatric medication treatment. (ECF Nos. 41-7 at 3; 41-18 at 64, 41-19 at 1-4.)

28. The next encounter Dr. Walcott had with plaintiff was at the Keyhea hearing on April 15, 2015, where Dr. Walcott testified before Administrative Law Judge Daryl Katcher in support of the need to renew plaintiff's Keyhea order. (ECF No. 41-7 at 3.)

29. The final encounter Dr. Walcott had with plaintiff, prior to this lawsuit, was as a Psychiatric Physician On Call where he provided plaintiff with a single dose of emergency treatment with the injectable medication Geodon on June 29, 2014, when plaintiff refused to take Depakote. This was in conjunction with plaintiff's admission to the MHCB for the purposes of addressing concerns of plaintiff's imminent danger to himself and others. (ECF Nos. 41-7 at 4; 41-17 at 4.)

30. Plaintiff was admitted to the MHCB after he refused his court-ordered medications, slammed his head on the cell window, and was pepper sprayed in order to stop him from further harming himself. While being escorted out of the housing unit, plaintiff became resistive, causing the escorting officer to use force to subdue him. The officer was also injured and required treatment at an outside hospital. When contacted by treating medical staff, Dr. Walcott approved emergency medication for plaintiff due to the emergent situation and in order to prevent further harm. This was not a face-to-face encounter and Dr. Walcott had no subsequent contact with the plaintiff. (ECF Nos. 41-7 at 4; 41-18 at 63.)

31. On March 11, 2016, Dr. Curren again evaluated plaintiff for a Keyhea Order renewal based on plaintiff's continued danger to himself and others, as well as the unlikelihood that plaintiff would continue to take the necessary psychiatric medications without a court order. Plaintiff was no longer on Depakote at this time. (ECF Nos. 41-4 at 3-4; 41-18 at 1, 4.)

32. While plaintiff had improved due to the medication, Dr. Curren recommended that the Keyhea order be renewed because plaintiff still lacked the necessary insight to understand that his mental disorder is lifelong. (ECF No. 41-18 at 4.)

33. Plaintiff remains medicated under a Keyhea order as of the date of this filing. (ECF No. 41-8 at 3.)

34. Plaintiff is diagnosed with severe bipolar mood disorder, mixed, a condition that renders him a danger to himself and others. (ECF Nos. 1 at 20; 41-4 at 3; 41-5 at 2; 41-8 at 3; 41-10 at 4, 41-11 at 1-2; Pl. Dep. at 37.)

35. Plaintiff often lies to his mental health professionals and tells them he is suicidal to get what he wants. (Pl. Dep. at 35-36; 48.)

36. Plaintiff does not think he needs to be on any psychiatric medications and would not take medication for his bipolar mental disorder if he was not on a Keyhea order. (ECF No. 41-4 at 3; Pl.'s Dep. at 42, 43, 47.)

37. Plaintiff lacks the capacity to consent to a proposed course of treatment due to his mental illness. (ECF No. 41-4 at 4.)

38. Plaintiff's mental health remains unstable through present and he claims if he is ever released from prison he will "shoot it out" with police officers (in other words, suicide by cop). (ECF No. 41-8 at 3; Pl. Dep. at 36.)

39. Depakote is a medication properly prescribed by psychiatrists to treat bipolar depression and psychosis. (ECF Nos. 41-5 at 2; 41-6 at 3; 41-8 at 3-4.)

40. In rare cases, Depakote has been associated with risk of transaminitis (elevated liver function tests). This can be thought of as a mild degree of liver irritation or inflammation. Typically, stopping or reducing Depakote will remove the offending agent and the patient will recover without any residual health problems. (ECF Nos. 41-5 at 2; 41-7 at 4; 41-8 at 3-4.)

41. Because of this risk, patients on Depakote are carefully monitored. (ECF No. 41-5 at 2.)

42. Generally, physicians will continue treatment with Depakote until transaminitis reaches the range of three times normal. (ECF No. 41-7 at 4.)

43. Both weight gain and weight loss are reported Depakote side effects. (ECF No. 41-8 at 3-4, 16-69 (Ex. B).)

44. Depakote does not cause diabetes. (ECF Nos. 41-5 at 4; 41-7 at 6, 11-13 (Ex. B); 41-8 at 3-4; 16-69 (Ex. B).)

45. Plaintiff was prescribed Depakote from approximately April 2013, through September 2015, to treat his serious bipolar mental health condition which causes him to be a danger to himself and others if not properly medicated. (ECF Nos. 41-8 at 3; 41-10 at 1 to 41-11 at 2.)

46. Plaintiff was informed of any possible Depakote side effects. (ECF Nos. 41-4 at 3; 41-5 at 2-3; 41-10 at 6, 41-14 at 6; 41-18 at 44.)

47. Dr. Curren initially elected to treat plaintiff with Depakote because it presented with the least amount of possible side effects and was the most effective drug to treat plaintiff's bipolar condition. Any side effects plaintiff could potentially face were far outweighed by the medicinal benefit. Additionally, at the time of the initial prescription, plaintiff did not present with any warning signs that would encourage a different prescription. Plaintiff would be closely monitored by medical staff to insure he did not experience any adverse side effects that negatively affected his health to the extent that they outweighed his benefit from the medication. (ECF No. 41-4 at 3.)

48. Dr. Haque continued plaintiff's Depakote prescription while he was plaintiff's treating psychiatrist, between December 19, 2013, and April 15, 2014. (ECF No. 41-5 at 2.)

49. When Dr. Haque evaluated plaintiff on April 15, 2014, plaintiff requested a lower dose of Depakote because he claimed it made him feel nauseous in the morning. Dr. Haque reduced plaintiff's prescription from 500 mg twice daily to just once at night. (ECF Nos. 41-5 at 3; 41-14 at 7-8.)

50. On September 16, 2015, plaintiff's treating psychiatrist discontinued plaintiff's Depakote prescription, writing that he was acceding to plaintiff's request to be treated with a drug other than Depakote. The psychiatrist also documented plaintiff's belief that Depakote had caused him to become diabetic. The psychiatrist did not agree, citing plaintiff's dietary indiscretions and lack of exercise as probable causes for his diabetes. The drugs prescribed in

place of Depakote were oxcarbazepine (Trileptal) and citralopram (Celexa).  (ECF Nos. 41-8 at 5; 41-12 at 5.)

51.  Dr. Walcott never prescribed Depakote, or renewed a Depakote prescription, for plaintiff.  (ECF No. 41-7 at 14; medical records, *passim*.)

52.  Dr. Swartz had no role in selecting the medications plaintiff was prescribed to treat his mental illness.  (ECF No. 41-6 at 2-3.)

53.  Dr. Swartz did approve two Depakote renewals on December 24, 2014, and January 2, 2015, after medical staff contacted her because plaintiff's prescription ran out and his treating doctor was not available to renew the prescription.  (ECF Nos. 41-6 at 2-3; 41-15 at 11-12; 41-16 at 1-2.)

54.  Dr. Swartz had no clinical contact with plaintiff and was never his treating psychiatrist, but she did review his medical records and discuss his reaction to Depakote with medical staff before renewing the prescriptions.  (ECF No. 41-6 at 3-4.)

55.  Based on plaintiff's medical records, test results, and discussion with medical staff, there was no medical indication to stop plaintiff's Depakote prescription.  (ECF No. 41-6 at 3.)

56.  A normal liver function test is 9-46, therefore liver function tests indicate transaminitis at 138.  The degree of liver inflammation in plaintiff's case is far below this threshold and inconsequential to his overall physical health.  (ECF No. 41-7 at 4.)

57.  The definition of toxic liver injury is more than 25 times upper limit of normal, or 1150.  (ECF No. 41-7 at 5.)

58.  Plaintiff's abnormal liver tests, or transaminitis, was very mild, and short lived.  (ECF No. 41-7 at 5.)

59.  Plaintiff's other measures of liver function were essentially normal while he was prescribed Depakote.  (ECF No. 41-8 at 3-4, n.2.)

60. On April 10, 2013, prior to plaintiff starting Depakote, his blood tests revealed normal liver function.  (ECF Nos. 41-8 at 4; 41-11 at 5-6.)

61.  Subsequent laboratory tests after Depakote was prescribed, on May 29, 2013, December 27, 2013, January 15, 2014, June 19, 2014, July 3, 2014, and October 8, 2014, likewise

did not show any evidence of liver dysfunction/damage and no basis upon which to consider plaintiff unfit for continued treatment with Depakote.  (ECF Nos. 41-5 at 2; 41-8 at 4; 41-11 at 5-10, 14-15; 41-21 at 2-4.)

62.  Plaintiff only had slightly elevated liver test results, or transaminitis, three times from 2013 through 2015:  7/27/15 (90); 8/15/15 (88); and 12/2/15 (78).  (ECF Nos. 41-12 at 1, 6; 41-19 at 5-6.)

63.  On a September 4, 2015 medical follow up visit, plaintiff's medical physician did not find any evidence of liver dysfunction.  (ECF Nos. 41-8 at 6; 41-12 at 3-4.)

64.  On March 16, 2017, plaintiff's liver function tests were barely abnormal with AST of 80.  The slightly abnormal liver test results would have been most likely due to plaintiff's alcohol consumption.  (ECF Nos. 41-8 at 6; 41-13 at 2-3.)

65.  Plaintiff's liver test results since the March 16, 2017 test, have all been normal.  (ECF Nos. 41-8 at 4, 6-7; 41-13 at 5-6, 13-16.)

66.  Plaintiff has no discernable liver damage, caused by Depakote or otherwise.  (ECF No. 41-8 at 7, 8-9.)

67.  Plaintiff's liver function tests were never seriously abnormal, and there was never any clinical sign of liver dysfunction.  Any liver damage that plaintiff might have incurred during the time he was taking Depakote would have been due to his alcohol abuse.  (ECF No. 41-8 at 8-9.)

68.  Plaintiff has drunk alcohol in excess since he was a child.  (Pl. Dep. at 16-19.)

69.  Plaintiff frequently consumes inmate manufactured alcohol, "white lightening," while incarcerated.  (Pl. Dep. at 17.)

70.  White Lightning is a strong form of inmate manufactured alcohol similar to Moonshine.  (Pl. Dep. at 18-19.)

71.  Plaintiff was unable to consume alcohol while placed in the Psychiatric Services Unit ("PSU") from June 14, 2013 through June 11, 2014.  (Pl. Dep. at 19; ECF No. 41-22 at 2, 4.)

72.  When not in PSU, prior to plaintiff turning 40 in May 2017, he drank alcohol daily.  Since May 2017, he drinks three to four times a year.  (ECF No. 41-7 at 5; Pl. Dep. at 12; 17-19.)

73.  Alcohol consumption, especially in a binging pattern, is a serious risk factor for

transaminitis and is more likely the cause of plaintiff's abnormal test results, not Depakote. (ECF Nos. 41-7 at 5; 41-8 at 7, 9.)

74. The ingestion of alcohol, by virtue of its dense caloric content and effects on appetite is also very well known to promote weight gain. (ECF No. 41-8 at 7.)

75. On June 10, 2013, plaintiff weighed 190 pounds. (ECF Nos. 41-8 at 4; 41-11 at 11.)

76. On July 8, 2013, plaintiff weighed 192 pounds. (ECF Nos. 41-7 at 6;[3] 41-19 at 15.)

77. On February 7, 2014, plaintiff weighed 220 pounds. (ECF Nos. 41-7 at 6; 41-19 at 16.)

78. On July 15, 2014, plaintiff weighed 227 pounds. (ECF Nos. 41-7 at 6; 41-8 at 4; 41-11 at 12; 41-20 at 1.)

79. On December 1, 2014, plaintiff weighed 246 pounds. (ECF Nos. 41-7 at 6; 41-20 at 2.)

80. On April 9, 2015, plaintiff weighed 240 pounds. (ECF Nos. 41-7 at 6; 41-20 at 3.)

81. On August 9, 2015, plaintiff weighed 250 pounds. (ECF Nos. 41-8 at 5; 41-11 at 16.)

82. On December 9, 2015, plaintiff weighed 250 pounds. (ECF Nos. 41-7 at 6; 41-8 at 5-6; 41-20 at 4.)

83. At plaintiff's December 9, 2015 appointment, his physician recommended plaintiff reduce his caloric intake. (ECF Nos. 41-8 at 5-6; 41-12 at 8; 41-20 at 4.)

84. On March 18, 2016, plaintiff weighed 237 pounds. (ECF Nos. 41-7 at 7; 41-20 at 5.)

85. On November 2, 2016, plaintiff weighed 246 pounds. (ECF Nos. 41-7 at 7; 41-20 at 7.)

86. On December 30, 2016, plaintiff weighed 259 pounds. (ECF Nos. 41-7 at 7; 41-8 at 6; 41-20 at 9.)

87. On October 18, 2017, plaintiff weighed 222 pounds. (ECF Nos. 41-7 at 7; 41-8 at 6-7; 41-21 at 1.)

88. Only nine percent of patients on Depakote experience significant weight gain. (ECF

---

[3] Dr. Walcott references medical records at 207-18; however, the pertinent medical records are Bate stamped 213-19; 221, 223-24.

No. 41-8 at 7.)

89.  Six percent of patients on Depakote experience weight loss.  (Id.)

90.  Plaintiff's fluctuating weight was not good cause to stop his Depakote prescription. (ECF No. 41-8 at 8.)

91.  This pattern of increased weight is more likely due to other factors such as poor diet, lack of exercise, and likely genetic predispositions, than to Depakote.  (ECF Nos. 41-5 at 4; 41-7 at 7.)

92.  Because plaintiff's weight did not decrease once he stopped taking Depakote, and instead even increased, his weight gain was not due to Depakote.  Rather, his weight gain was likely due to his dietary indiscretions, frequent high caloric illicit alcohol consumption, and lack of exercise.  (ECF Nos. 41-5 at 4; 41-8 at 6, 7, 9; 41-22 at 2, 5-15 (Ex. B); Pl. Dep. 33-34; 50; 51.)

93.  The cause of diabetes is multifactorial, including one's genes/family history.  (ECF Nos. 41-7 at 6; 41-8 at 7.)

94.  Diabetes is diagnosed in accord with criteria set forth by the American Diabetes Association (ADA).  A person is diagnosed with diabetes only if one of four measures can be verified: 1) blood glucose over 126 measured after fasting for 8 or more hours; 2) blood glucose of more than 200, when measured 2 hours after ingestion of 75 grams of glucose; 3) HA1c level equal or greater than 6.5; or 4) random glucose measurement over 200 in a patient with symptoms of elevated blood glucose.  (ECF No. 41-8 at 4 & n.5.)

95.  The range of values for HbA1c healthy (non-diabetic) adults is 4% to 5.7%.  HbA1c levels over 5.7 do not diagnose diabetes.  Rather, levels from 5.7% to 6.4% indicate difficulty in processing sugar.  The condition--called "glucose intolerance" or "pre-diabetes"--is found commonly in seriously overweight individuals.  Another laboratory sign of pre-diabetes is random blood sugar levels over 100 but less than 126.  (ECF No. 41-8 at 4 & n.4.)

96.  One of plaintiff's primary relatives died due to diabetes related complications.  (Pl. Dep. at 21.)

97.  Additional risk factors for developing diabetes include a poor diet and not exercising

regularly.  (ECF Nos. 41-7 at 6; 41-8 at 4.)

98.  Plaintiff has a long history of frequently eating fried foods and foods high in fat, "soul food rich in fat," which admittedly made his health "not good."  (Pl. Dep. at 33-34.)

99.  During the times relevant to plaintiff's lawsuit, he made poor eating choices and did not exercise regularly.  (Pl. Dep. at 24; 50; 51; ECF Nos. 41-22 at 2, 5-15 (Ex. B).)

100.  Plaintiff's laboratory test results met none of the above criteria while he was taking Depakote, therefore he was not diabetic during that time.  (ECF No. 41-8 at 4 & n.5.)

101.  On April 10, 2013, prior to plaintiff starting Depakote, his blood tests revealed no indication of diabetes.  (ECF Nos. 41-8 at 4; 41-11 at 5-6.)

102.  Subsequent laboratory tests after Depakote was prescribed, on May 29, 2013, and January 15, 2014, likewise did not show any evidence of diabetes and no basis upon which to consider plaintiff unfit for continued treatment with Depakote.  (ECF Nos. 41-8 at 4; 41-11 at 7-10.)

103.  Lab tests performed on October 13, 2014, to measure plaintiff's blood sugar over time, showed a reading of 5.7.  (ECF Nos. 41-8 at 4; 41-11 at 13.)

104.  Plaintiff's borderline abnormal HbA1c reading on October 13, 2014, was likely due to his increased weight.  Plaintiff's weight gain put him at risk of becoming diabetic (also described as being pre-diabetic), but he was not diabetic at this time.  (ECF No. 41-8 at 4.)

105.  In July 2015, plaintiff's HbA1c result was 7.4, supporting a new diagnosis of diabetes for which the oral medication metformin was prescribed.  (ECF Nos. 41-8 at 5, 41-11 at 16; 41-12 at 1-2.)

106.  By September 4, 2015, plaintiff's HbA1c had fallen to 7.0.  Plaintiff did not present with any diabetes symptoms.  (ECF Nos. 41-8 at 5; 41-12 at 3-4.)

107.  On December 2, 2015, about three months after discontinuation of Depakote, plaintiff's blood glucose was 112, and HbA1c was 6.4.  These lab values do not meet the criteria for diabetes but are consistent with pre-diabetes.  (ECF Nos. 41-8 at 5-6; 41-12 at 6-7.)

108.  Plaintiff's blood tests showed his HbA1c at 6.4 on July 12, 2016, indicating a continued pre-diabetic state.  (ECF Nos. 41-8 at 6; 41-12 at 9.)

109. Plaintiff's HbA1c on November 9, 2016, was nearly the same at 6.6, but technically in diabetes range. (ECF Nos. 41-8 at 6; 41-12 at 10.)

110. On March 16, 2017, plaintiff's random blood sugar level of 103 and his HbA1c of 6.2 no longer met criteria for diabetes. (ECF Nos. 41-8 at 6; 41-13 at 2-3.)

111. Plaintiff's October 17, 2017 labs were significantly improved, with an HbA1c of 5.6, indicating he did not have diabetes. (ECF Nos. 41-8 at 6-7; 41-13 at 4-6.)

112. Plaintiff has been told by his doctors to eat healthier and work out in order to help his health. (Pl. Dep. at 50.)

113. Plaintiff did not work out from 2013 through August 2017. (Pl. Dep. at 51-53.)

114. As plaintiff lost weight in 2017, his blood tests improved. (ECF No. 41-8 at 6.)

115. Plaintiff did not suffer from any objective symptoms of diabetes during this time, such as skin ulcers, eye disease, or kidney failure. (ECF Nos. 41-8 at 5-6 & n.7; 41-13 at 7-10.)

116. Plaintiff's condition hovered between pre-diabetes and diabetes due to his failure to reduce his caloric intake and lose weight as directed by medical staff. Plaintiff's illicit alcohol consumption also likely contributed to his condition. (ECF No. 41-8 at 5, 9.)

117. As recent as June 13, 2018, plaintiff had a normal HbA1c at 5.0, indicating that plaintiff is not diabetic and not at risk of diabetes (i.e. not "pre-diabetic"). (ECF Nos. 41-8 at 3, 9; 41-13 at 13-16.)

118. Depakote did not cause plaintiff to become diabetic or pre-diabetic. (ECF No. 41-8 at 7.)

119. Plaintiff did not suffer any demonstrable or measured health damage from his pre-diabetes or brief diabetic condition. (ECF No. 41-8 at 9.)

120. Plaintiff believes he is dying from liver damage and diabetes, however, no medical health professional has ever told him he is dying. (Pl. Dep. at 19, 20.)

121. Plaintiff believes Depakote caused him to get liver damage and diabetes because he read it on the Internet. (Pl. Dep. at 40.)

122. Dr. Swartz, Dr. Walcott and Dr. Barnett opine that there is no evidence that any of plaintiff's treating psychiatrists or physicians were indifferent to plaintiff's medical care for

13

prescribing or renewing Depakote. Any risk plaintiff faced from any Depakote side effects is far outweighed by the benefit he received from Depakote. (ECF Nos. 41-6 at 4; 41-7 at 7; 41-8 at 8;

123. Plaintiff's health care providers, including defendants, vigilantly monitored the efficacy and safety of Depakote and other pharmacologic therapies being provided to plaintiff. (ECF Nos. 41-8 at 8; 41-6 at 4.)

124. There is no evidence in the many physical exams and laboratory testing that plaintiff underwent to indicate that he suffered any harm from Depakote. (ECF No. 41-8 at 8.)

125. Any side effects plaintiff may have encountered from Depakote were far outweighed by the psychological benefit he received from the medication. (ECF No. 41-5 at 4.)

126. Plaintiff's Depakote prescription was proper. (ECF No. 41-8 at 7, 9.)

IV. Summary Judgment Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." <u>Walls v. Central Costa County Transit Auth.</u>, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

| | |
|---|---|
| 1 | aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing |
| 2 | party "must do more than simply show that there is some metaphysical doubt as to the material |
| 3 | facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the |
| 4 | nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation |
| 5 | omitted). |
| 6 | By contemporaneous notice provided on August 3, 2018 (ECF No. 41-1), plaintiff was |
| 7 | advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal |
| 8 | Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); |
| 9 | Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). |
| 10 | V.  Legal Standards |
| 11 | The Civil Rights Act under which this action was filed provides as follows: |

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

| | |
|---|---|
| 15 | 42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the |
| 16 | actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See |
| 17 | Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 |
| 18 | (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the |
| 19 | meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or |
| 20 | omits to perform an act which he is legally required to do that causes the deprivation of which |
| 21 | complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). |
| 22 | "The Eighth Amendment's prohibition against cruel and unusual punishment protects |
| 23 | prisoners not only from inhumane methods of punishment but also from inhumane conditions of |
| 24 | confinement."  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006), citing Farmer v. |
| 25 | Brennan, 511 U.S. 825, 832 (1994).  In order to prevail on a claim of cruel and unusual |
| 26 | punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious |
| 27 | deprivation and that subjectively prison officials acted with deliberate indifference in allowing or |
| 28 | causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991). |

To prevail on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to the need was deliberately indifferent. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976). To establish a serious medical need, the plaintiff must show that the "failure to treat [the] . . . condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett, 439 F.3d at 1096 (citation omitted). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

For a prison official's response to a serious medical need to be deliberately indifferent, the official must "'know[ ] of and disregard[ ] an excessive risk to inmate health.'" Peralta v. Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting Farmer, 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Wilhelm, 680 F.3d at 1122.

A difference of opinion between a physician and the prisoner, or between medical professionals, regarding what medical care is appropriate does not constitute deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986). Rather, plaintiff is required to demonstrate that the course of treatment the medical professional chose was medically unacceptable under the circumstances, and that the medical professional chose such course in

conscious disregard of an excessive risk to plaintiff's health.  Jackson, 90 F.3d at 332.  Deliberate

indifference may be found if defendants "deny, delay, or intentionally interfere with [a prisoner's

serious need for] medical treatment."  Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

In order to prevail on a claim involving defendants' choices between alternative courses of

treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the

circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health."

Jackson, 90 F.3d at 332.  In other words, so long as a defendant decides on a medically acceptable

course of treatment, his actions will not be considered deliberately indifferent even if an

alternative course of treatment was available.  Id.

VI. Discussion

A. Serious Medical Need

The parties do not dispute, and the undersigned finds, that based upon the evidence

presented by defendants in connection with the pending motion, a reasonable juror could

conclude that plaintiff's severe bipolar disorder constitutes an objective, serious medical need.

See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or

patient would find important and worthy of comment or treatment; the presence of a medical

condition that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain are examples of indications that a prisoner has a 'serious' need for medical

treatment.").

B. Deliberate Indifference

In his unverified opposition, plaintiff claims to dispute all of the facts set forth in

defendants' statement of undisputed facts.  (ECF No. 48.)  However, plaintiff provided no

declaration in support of his opposition, or citations to his deposition or medical records.  Plaintiff

also failed to provide his own statement of undisputed facts, or to specifically address each of the

facts set forth in defendants' statement of undisputed facts and support his position with

competent evidence.  L.R. 260(b).  Although plaintiff included arguments concerning his claims,

he failed to cite to any medical records or other evidence in support.  (ECF No. 48 at 1-18.)

Moreover, plaintiff's verified but conclusory statements included in his original complaint are

insufficient absent competent medical evidence in support thereof.

Thus, plaintiff wholly failed to rebut, with competent evidence, the doctors' opinions that none of the defendants were indifferent in their care of plaintiff, and the medical records support the doctors' opinions. Indeed, the medical records provided by defendants demonstrate plaintiff was monitored closely and tested while he was prescribed Depakote, even if it was not always performed by plaintiff's treating physician. (See, e.g., ECF No. 41-8 at 8 n.10.)

Moreover, to the extent plaintiff disagrees with the doctors' opinions as to whether or not the side effects of Depakote caused plaintiff's weight gain[4] or any liver damage, such disagreement is insufficient to state a cognizable civil rights claim. Plaintiff's difference of opinion regarding what prescription or other medical treatment was appropriate does not constitute deliberate indifference. Sanchez, 891 F.2d at 242; Wilhelm, 680 F.3d at 1122-23. Rather, plaintiff must demonstrate that the course of treatment his doctors chose was medically unacceptable under the circumstances, and that his doctors chose such course in conscious disregard of an excessive risk to plaintiff's health. Jackson, 90 F.3d at 332. Plaintiff points to no evidence demonstrating that the course of treatment was medically unacceptable or posed an excessive risk to his health, and provides no expert medical opinion to refute the medical opinions provided by defendants.

Contrary to plaintiff's unverified claim that the Depakote prescription was stopped because it damaged his liver, the medical record reflects that his treating psychiatrist discontinued the medication "given [plaintiff's] strong concerns about that medication." (ECF No. 41-12 at 5.) Such treating psychiatrist prescribed oxcarbazepine in place of the Depakote.[5] (Id.) The treating

---

[4] In his deposition, plaintiff claimed he gained 50 pounds in one month. (Pl. Dep. at 53.) However, the medical records do not support such contention. Rather, plaintiff gained 60 pounds while taking Depakote from June 10, 2013, to August 9, 2015, a period of 2 years, 3 months, and 22 days. (UDF 75, 81.) In the list of Depakote side effects provided by plaintiff, "rapid weight gain" is listed as a side effect. (ECF No. 48 at 20.) However, gaining 60 pounds over a two plus year period cannot be described as rapid. Nevertheless, plaintiff provided no medical evidence connecting his weight gain to the Depakote.

[5] In his opposition, plaintiff claims that Olanzapine is the brand name for Depakote, and also claims that oxcarbazepine's brand name is Olanzapine. (ECF No. 48 at 11.) Plaintiff also provides lists of side effects of both Depakote and Olanzapine. (ECF No. 48 at 20-28.) However,

psychiatrist noted that plaintiff claimed, "I don't like this medication," and wrote that plaintiff "insist[ed] that the low dose [Depakote] [was] giving him diabetes, despite his unhealthy diet and exercise choices." (ECF No. 41-12 at 5; UDF 50.) Such change in medication, standing alone, is insufficient to demonstrate deliberate indifference on the part of the doctor who previously prescribed Depakote.

In addition, Dr. Barnett opined that plaintiff suffered no "discernable liver damage;" his "liver function tests were never seriously abnormal, and there was never any clinical sign of liver dysfunction." (ECF No. 41-8 at 8.) Similarly, Dr. Walcott opined that plaintiff's "transaminitis was very mild, and short lived," and "completely resolved" by October 17, 2017." (ECF No. 41-7 at 5.) Dr. Walcott opined that had plaintiff sustained ongoing liver injury, he would have long term elevated AST and ALT tests, "not sporadic . . . as they are with [plaintiff]." (Id.) Plaintiff adduced no competent evidence rebutting such opinions.

Further, plaintiff failed to rebut the medical evidence that Depakote does not cause diabetes. (UDF 44.) Moreover, Dr. Barnett questioned whether plaintiff had diabetes, because "between August 2015 and November 2017, plaintiff's blood tests showed excellent blood sugar control more consistent with a diagnosis of 'pre-diabetes,'" but did not suffer from any objective symptoms of diabetes. (ECF No. 41-8 at 5 n.7.) In any event, plaintiff has failed to demonstrate, via competent evidence, that his diabetes or pre-diabetes was caused by Depakote.

In conclusion, although plaintiff believes that he suffered an excessive risk to his health from the prescription of Depakote, he adduced no competent evidence from which a jury could so find in light of defendants' medical evidence. Thus, defendants are entitled to summary judgment.

////

////

---

the oxcarbazepine (Trileptal) was prescribed in place of the Depakote, and Olanzapine was discontinued at the same time that Depakote, also known as divalproex sodium, was discontinued. (ECF No. 41-12 at 5; see also 41-8 at 5.) Oxcarbazepine and Olanzapine are not the same as Depakote, and such other drugs or their side effects are not at issue in this action. (ECF Nos. 1, passim; 41-12 at 5; 49 at 3.)

VII.  Qualified Immunity

The undersigned finds that plaintiff has not established an Eighth Amendment violation, and therefore need not address the issue of qualified immunity.

VIII.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 41) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 7, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/chas2080.msj.med

21